UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| HOSANNA MILLER, FAITH RUSSELL, AND RACHEL MILLER, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED, <br><br> PLAINTIFFS, <br><br> V. <br><br> VISION OF HOPE MINISTRIES, INC. AND FAITH CHURCH OF LAFAYETTE, INC., <br><br> DEFENDANTS. | CASE NO.: 4:25-CV-33 |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Hosanna Miller, Faith Russell, and Rachel Miller, individually and on behalf of those similarly situated, bring this action against Defendants Vision of Hope Ministries, Inc. and Faith Church of Lafayette, Inc. for violation of the Trafficking Victims Protection Act, 18 U.S.C. 1581 *et seq.*, and in support of their Complaint show as follows:

**INTRODUCTION**

Vision of Hope Ministries, Inc. and its *de facto* parent Faith Church of Lafayette, Inc. operate what they refer to as a residential counseling facility. While it is a residence and while some counseling happens there, it also serves the purpose of furnishing Vision of Hope, Faith Church, and other branches of Faith Church's ministries with unpaid labor. To keep that steady supply of unpaid labor coming from the residents, Vision of Hope uses the threat of serious psychological and reputational harm. Faith Church obtains the unpaid labor of the residents by and through Vision of Hope's compulsion of labor through the threats of serious psychological and reputational harm. This violates the "forced labor" provisions of the Trafficking Victims Protection Act, 18 U.S.C. 1581 *et seq.*, particularly the provisions of §1589. Plaintiffs bring this civil action pursuant to 18 U.S.C. §1595 for relief attendant to their exploitation as forced laborers.

## PARTIES

1. Plaintiff Hosanna Miller is an individual who resides in Tippecanoe County, Indiana.

2. Plaintiff Faith Russell is an individual who resides in Madison County, Iowa.

3. Rachel Miller is an individual who resides in St. John's County, Florida.

4. Vision of Hope Ministries is an Indiana non-profit corporation with its principal place of business in Tippecanoe County, Indiana.

5. Faith Church of Lafayette, Inc. is an Indiana non-profit corporation with its principal place of business in Tippecanoe County, Indiana.

## JURISDICTION AND VENUE

6. This Court properly has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as Plaintiffs are asserting a claim arising under federal law.

7. This Court is a proper venue for Plaintiffs' claims pursuant to 28 U.S.C. §1391 inasmuch as Defendants may be found in this district, and because a substantial portion of the events giving rise to Plaintiffs' claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

8. Hosanna Miller was a resident at Vision of Hope beginning in the fall of 2021.

9. Rachel Miller was a resident at Vision of Hope.

10. Faith Russell was a resident at Vision of Hope.

11. During their time as residents, Defendants expected Hosanna, Rachel, Faith, and those similarly situated to perform a substantial amount of labor for which Defendants paid her no compensation.

12. Defendants obtained residents' forced, unpaid labor by means of threats of psychological harm.

13. Defendants obtained forced, unpaid labor from Hosanna, Rachel, Faith, and those similarly situated by means of threats of reputational harm.

14. The women who came to Vision of Hope, including Plaintiffs, were seeking help for problems.

15. Often these women were sent by their families or their churches.

16. Often, the families or churches of women sent to Vision of Hope are paying hundreds of dollars per month for the women to be at Vision of Hope.

17. Once the women have arrived at Vision of Hope and the program had the steady stream of income related to their participation in the program, the residents generally received about one hour per week of "biblical counseling."

18. Aside from the "biblical counseling," residents at Vision of Hope were expected to assist with household chores like cooking, cleaning, and lawn care.

19. In addition to the chores that Vision of Hope residents were expected to help with around the Vision of Hope house, they were also expected to devote considerable portions of their time to unpaid, forced labor for the benefit of Faith Church and its various arms.

20. Vision of Hope residents were forced to perform unpaid labor at the Reclaimed Hope retail store.

21. Vision of Hope residents were forced to perform unpaid labor at Faith Church's Northend Community Center.

22. Vision of Hope residents were forced to perform unpaid labor at Faith Church's Senior Living Community.

23. Vision of Hope residents were forced to perform unpaid labor at Faith Church's facilities, including its gymnasium and / or recreation center.

24. Vision of Hope residents were forced to perform unpaid labor doing landscaping and lawn care for various Faith Church branches.

25. Though Vision of Hope residents were permitted to speak to their families while they were part of the program, those communications were carefully monitored by Vision of Hope.

26. Often, Vision of Hope residents were dealing with struggles with their families.

27. Often, Vision of Hope residents were dealing with struggles which are known to their families.

28. If a Vision of Hope resident did not wish to participate in the forced, unpaid labor, Vision of Hope would often threaten to tell the resident's family that the resident was "in rebellion."

29. This represented a substantial threat of serious psychological harm.

30. This also represented a substantial threat of serious reputational harm.

31. If a Vision of Hope resident did not wish to participate in the forced, unpaid labor, Vision of Hope would often threaten residents with a "consequence."

32. A "consequence" could include community shunning of the non-compliant resident.

33. This ever-present threat of community shunning of the non-compliant resident represented a substantial threat of serious psychological harm.

34. This ever-present threat of community shunning of the non-compliant resident represented a substantial threat of serious reputational harm.

35. Residents planned their weekly schedules.

36. Residents' planned schedules were reviewed by Vision of Hope personnel.

37. Residents' planned schedules were required to have adequate time allotted for residents to participate in the forced, unpaid labor demanded by Vision of Hope.

38. If a resident sought to allot additional time for bible study and Vision of Hope deemed the planned time for labor participation inadequate, Vision of Hope could and did alter the

resident's schedule to meet Vision of Hope's demands for the resident's unpaid labor, including displacing bible study for more labor.

39. Vision of Hope and Faith Church used the residents at Vision of Hope as forced, unpaid labor to reduce their need to pay employees for cleaning.

40. Vision of Hope and Faith Church used the residents at Vision of Hope as forced, unpaid labor to reduce their need to pay employees for landscaping and lawn care.

41. Vision of Hope and Faith Church used the residents at Vision of Hope as forced, unpaid labor to reduce their need to pay employees for retail store staffing.

42. Vision of Hope and Faith Church used the residents at Vision of Hope as forced, unpaid labor to reduce their need to pay employees for running errands.

43. If a resident did not wish to participate in the forced, unpaid labor, sometimes the resident would be given a "consequence" of doing additional bible homework.

44. If a resident did not wish to participate in the forced, unpaid labor, sometimes the resident would be given a "consequence" of the "silent treatment."

45. If a resident did not wish to participate in the forced, unpaid labor, sometimes the resident would be given a "consequence" of losing their free time.

46. Residents often felt afraid to leave or unable to leave because of the threats of psychological harm.

47. Residents often felt afraid to leave or unable to leave because of the threats of reputational harm.

48. Residents who left the program were subjected to communal shunning, forcibly losing relationships that they have cultivated during their time as a resident.

49. This communal shunning is a serious psychological harm.

50. This communal shunning is a serious reputational harm.

51. Though residents had the option to leave Vision of Hope and thus end their forced labor, that option was often an illusion because of the threat of serious psychological and / or reputational harm.

52. Residents were also subjected to threats of serious physical harm by Vision of Hope's use of food restrictions and food control.

53. Residents were often given inadequate food.

54. The inadequate food posed a serious risk of physical harm to residents by means of malnutrition.

55. The food control exercised by Vision of Hope also posed a serious risk of psychological harm, as some residents at Vision of Hope were there for counseling for eating disorders.

56. Residents were not permitted to eat additional food.

57. Residents were required to eat all the food they were served, regardless of its quality or quantity.

58. Residents who did not eat all their food were potentially subjected to "consequences," including shaming, extra Bible study, or shunning.

59. Residents who complained about the quality of the food were potentially subjected to "consequences," including shaming, extra Bible study, or shunning.

60. If a resident was eventually allowed to take a job, residents were at constant risk for losing their jobs as a result of actions by Vision of Hope.

61. One of the "consequences" that could be imposed Vision of Hope was that a resident could be "phased back" such that they lost their "privilege" to have a job outside of their forced, unpaid labor for Vision of Hope.

62. If a resident was "phased back" such that she could no longer work at her job, this imposed a serious reputational harm on the resident.

63. If a resident was "phased back" such that she could no longer work at her job, she would potentially just disappear from the lives of the peer relationships and connections she had cultivated at the workplace.

64. This constant worry imposed a threat of serious psychological and reputational harm if a resident did not strictly comply with the instructions of Vision of Hope, including the demands for unpaid, forced labor.

## CLASS ACTION FACTUAL ALLEGATIONS

65. Plaintiffs bring this action on their own behalf and on behalf of those similarly situated, pursuant to Trial Rules 23(A) and B(3).

66. Plaintiffs seek to represent the class defined as:

> All individuals who are or have been residents of Vision of Hope within the last ten years who have been subjected to Defendants' common policy, pattern, practice, or plan whereby residents furnished forced, unpaid labor under the serious threat of psychological or reputational harm.

67. Excluded from the proposed class are individuals who make a timely election to be excluded as members of the class using the proper procedures for opting out, as well as the judges assigned to hear any aspect of this litigation and their immediate family members.

68. Plaintiffs reserve the right to amend the definitions of the class as further information is developed in discovery that would make proper the expansion, narrowing, or other modification of the definitions.

69. The potential members of the class are so numerous that the joinder of all members as named parties is impractical.

70. As of December 2024, there were nine current residents of Vision of Hope. Even if each resident stays for two years, the anticipated number of potential members of the class exceed 40.

71. The class will be readily identifiable from Vision of Hope's resident records.

72. Common questions of law and fact exist as to all members of the class and predominate over any questions affecting solely Plaintiffs. Among the questions of law and fact common to the class that predominate over questions individual to Plaintiffs are:

    a. Whether Defendants engaged in a policy, pattern, practice, or plan of using the threat of serious psychological harm to extort forced, unpaid labor from residents;

    b. Whether Defendants engaged in a policy, pattern, practice, or plan of using the threat of serious reputational harm to extort forced, unpaid labor from residents;

    c. The ordinary schedule for the time that residents devoted to forced, unpaid labor from residents;

73. Plaintiffs' claims are typical of those of other members of the class because Plaintiffs, like every other member of the class, were subjected to the same policy, pattern, practice, or plan whereby Defendants unlawfully used threats of serious psychological and / or reputational harm to extort forced, unpaid labor from residents.

74. This class action is also appropriate for certification because the unlawful and invalid policies, patterns, practices, or plans uniformly affected Plaintiffs and the members of the class by extorting from them forced, unpaid labor by means of threats of serious psychological and / or reputational harm.

75. Plaintiffs will fairly and adequately represent and protect the interest of the members of the class inasmuch as they have no known conflicts of interest that would be antagonistic to those of the other members of the class. Plaintiffs are not seeking relief that is adverse to any members of the class. The relief sought by Plaintiffs is for redress of the same rights and damages that they suffered, which are typical of the class. Furthermore, Plaintiffs have retained counsel experienced in class and collective action cases, and who intends to prosecute this action vigorously.

76. Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved. Treating this matter as a class action is superior inasmuch as it will permit a large number of members of the class to prosecute common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that would be required in the administration of hundreds of individual actions.

77. Furthermore, class action administration will permit the adjudication of claims that might otherwise be relatively modest, to the point that individuals might not be able to afford to litigate a complex claim against a powerful entity like Faith Church, which enjoys millions of dollars in revenue annually.

78. Additionally, it is in the interest of judicial economy to resolve this many claims in one action, as a multiplicity of actions would impose a burden on the courts.

79. The nature of this action makes the use of class action particularly efficient and appropriate, since individual adjudication would pit individuals of comparatively modest means against an entity with a budget in the tens of millions, with superior financial and legal resources.

80. The litigation of the claims of Plaintiffs and the members of the class would be manageable because of the uniformity of Defendant's conduct and its effect on Plaintiffs and members of the class.

81. Adequate notice can be given to members of the class using the information already in Defendants' possession, custody, or control.

82. There is little or no advantage to be gained by members of the class individually controlling the prosecution of separate actions

### COUNT I: VIOLATION OF THE FORCED LABOR PROVISIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT 18 U.S.C. 1581 *ET SEQ.*

83. Defendants induced or obtained the labor of Plaintiffs and those similarly situated through threats of serious harm.

84. Defendants acted knowingly or intentionally in inducing or obtaining the labor of Plaintiffs and those similarly situated.
85. Defendants' threats of serious harm included, but were not necessarily limited to, threats of psychological harm and threats of reputationally harm.
86. The threats made by Defendants were sufficiently serious, under all the surrounding circumstances, that a reasonable person of the same background in the same circumstances would feel compelled to perform or continue performing the labor to avoid incurring the harm.
87. Defendants benefitted from participation in the venture which was engaged in providing or obtaining the labor of Plaintiffs and those similarly situated.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of those similarly situated, demand the following relief:

1. A preliminary order requiring Defendants to cease their practice of unlawful forced labor by threats of serious psychological and reputational harm;
2. A permanent order requiring Defendants to cease their practice of unlawful forced labor by threats of serious psychological and reputational harm;
3. An order awarding compensatory damages to Plaintiffs and those similarly situated for their forced, unpaid labor
4. An order award punitive damages to Plaintiffs and those similarly situated;
5. An order awarding unpaid wages to Plaintiffs and those similarly situated for their forced, unpaid labor;
6. Plaintiffs' attorney's fees;
7. The costs of this action;

8. Such other relief as this Court determines to be necessary and appropriate.

    Respectfully submitted,

    /s/ Jason R. Ramsland
    Jason R. Ramsland (#29443-29)
    Ramsland Law LLC
    38 W. Main Street
    Suite 124
    Carmel, IN 46032
    jason@rams.land
    765.267.1240

    Attorney for Plaintiffs and the Proposed Class

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

    /s/ Jason R. Ramsland