UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| HOSANNA MILLER and FAITH RUSSELL, Individually and on behalf of those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> VISION OF HOPE MINISTRIES, INC. and FAITH CHURCH OF LAFAYETTE, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) CAUSE NO. 4:25-CV-33-PPS-JEM ) ) ) ) ) ) |

## **OPINION AND ORDER**

Hosanna Miller and Faith Russell, individually and behalf of those similarly situated, bring this class action complaint against Defendants Vision of Hope Ministries, Inc., and Faith Church of Lafayette, Inc., for violation of the Trafficking Victims Protection Act, 18 U.S.C. 1581 *et seq*. In essence, they claim the church forced residents of the Vision of Hope ministry program into unpaid labor by threatening serious psychological and reputational harm if they balked. Defendants have moved to dismiss the one and only claim in the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs have properly stated a claim, the motion to dismiss will be denied.

### **Background**

Here are the facts as described in the amended complaint. Vision of Hope Ministries and Faith Church of Lafayette, Inc., are Indiana non-profit corporations. [Am

Compl., DE 9, at 2.] Plaintiffs, Hosanna Miller and Faith Russell, were both residents at Vision of Hope, a residential counseling facility under the de facto parent of Faith Church. [*Id.* 1-2.] During their time as residents, Plaintiffs were expected "to perform a substantial amount of labor for which Defendants paid [them] no compensation." [*Id.* at 2.] The women came to Vision of Hope seeking help for their problems—they were often sent there by their families or churches who were paying hundreds of dollars per month for the women to be at Vision of Hope. *Id.* at 3.

At Vision of Hope, residents got about one hour per week of "biblical counsel"; in exchange they were expected to assist with household chores like cooking, cleaning, and lawn care. *Id.* In addition, they were expected to devote considerable portions of time to working unpaid labor to benefit Faith Church, like working at the Reclaimed Hope retail store, the church's community center and senior living center, other Faith Church facilities like its gymnasium and/or recreation center, and doing landscaping and lawn care for various Faith Church branches. *Id.* They cleaned, staffed the retail store, ran errands, and did other work. [*Id.* at 5.]

If a Vision of Hope resident didn't want to work, Vision of Hope would threaten to tell the resident's family the resident was "in rebellion" or threaten a "consequence" which included community shunning. [*Id.* at 4.] If the resident didn't include enough labor in her schedule, Vision of Hope altered the schedule including displacing Bible study for more labor. *Id.* Some consequences of not working enough were the silent treatment and losing free time. [*Id.* at 5.] Additionally, if a resident finally was allowed

2

to take a job outside of the ministry, another "consequence" that could be imposed by Vision of Hope was to "phase back" the resident so they lost their privilege of having an outside job. [*Id.* at 6.]

Residents often felt afraid to leave or unable to leave because of the threats of psychological and reputational harm. [*Id.* at 5.]   Residents who did leave "were subjected to communal shunning, forcibly losing relationships that they ha[d] cultivated during their time as a resident." *Id.*  Although residents could technically leave, Plaintiffs claim this was an "illusion" due to the real threats of psychological and reputational harm. [*Id.* at 6.]

According to the amended complaint, residents were often given inadequate food. *Id.*  While they were both "required to eat all the food they were served, regardless of its quality or quantity," they were also it seems, at times, not given enough food. *Id.*

According to the class action allegations, as of December 2024, there were 9 current residents of Vision of Hope. [*Id.* at 7.]  Plaintiffs estimate that if each resident stays for two years, the anticipated number of potential class members will exceed 40. *Id.*

There is one count stated in the amended complaint for violation of the TVPRA. Plaintiffs claim Defendants induced or obtained labor through threats of serious harm like psychological and reputational harm, and this was done knowingly or intentionally. [*Id.* at 10.] They request a preliminary and permanent injunction requiring

3

Defendants to cease their practice of unlawful forced labor, compensatory damages, punitive damages, and attorneys' fees and costs. *Id.*

## Discussion

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While I must accept all factual allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 556 U.S. at 678. Plaintiffs must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Section 1589, the Forced Labor statute, was enacted as part of the Trafficking Victims Protect Act of 2000. *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1030 (7th Cir. 2024). As the title broadcasts, the statute criminalizes the use of "forced labor":

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means - -
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;

4

>   (3) by means of the abuse or threatened abuse of law or legal process; or
>
>   (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
>   shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a).

As originally codified in 22 U.S.C. § 7101(a), the TVPRA was intended "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Congress also made twenty-four specific findings supporting that purpose and included these findings in the final legislation. 22 U.S.C. § 7101(b). These findings begin with a determination that "the degrading institution of slavery continues throughout the world" and characterizing the trafficking in persons as "a modern form of slavery." § 7101(b)(1). A number of the findings concern the sex trafficking and victimization of women and girls, *see* § 7101(b)(2), (4), (6), (9) & (11), but trafficking "is not limited to the sex industry," *see* § 7101(b)(3). Most of the findings concern the nature and seriousness of human traffickers and the tactics they employ, and the inadequacies of existing criminal laws to address trafficking. *See* § 7101(b)(4)–(15). Other findings focus on the vulnerability of the victims, and the harms that trafficking causes. *See* § 7101(b)(5)–(7), (9)–(11). None of the findings specifically discuss targeting church ministries.

Three years after enacting the TVPA, Congress passed the Trafficking Victims

Protection Reauthorization Act of 2003 (TVPRA).  The 2003 enactment added 18 U.S.C. § 1595, creating a civil remedy for victims of human trafficking against perpetrators of TVPA violations, including violations of the Forced Labor statute.  *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 548 (7th Cir. 2023).  At that time, the civil provision only imposed liability against the direct trafficker of the victims.  Pub. L. No. 108-193, 117 Stat. 2875, 2878 (codified at 18 U.S.C. § 1595).  In 2008, however, Congress expanded the scope of civil liability.  Pub. L. 110-457, 122 Stat. 5044.  Section 1595 of the Act now provides a civil remedy against not only the direct perpetrator, but also "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."  18 U.S.C. § 1595(a).

It is this civil remedy that these Plaintiffs currently invoke.  To recap, Section 1595(a) provides that a victim may bring a civil action for damages and attorney's fees against "the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  According to the TVPRA, "[t]he term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).

6

Defendants rely almost exclusively on two cases in support of their motion to dismiss. *See Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017 (7th Cir. 2024), and *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012). So I will give both cases an in depth review.

*Taylor* was decided about a year ago by the Seventh Circuit. That case deals with the Salvation Army which operated residential rehabilitation centers for "adults struggling with life's spiritual and social challenges." 110 F.4th at 1021. Some individuals enroll to deal with issues such as homelessness or substance abuse, and others are referred to the centers by the courts or parole/probation departments. *Id.* Participants receive food, clothing, and housing for the duration of their stay and, in return, are required to work approximately forty hours per week for the Salvation Army. *Id.* Although the Salvation Army characterizes the activity as "work therapy," the plaintiffs in *Taylor* contended it was in reality forced labor. *Id.* After finding plaintiffs' claims were not barred by the *Rooker-Feldman* doctrine, the Seventh Circuit nevertheless found they failed on the merits "because they participated in the Salvation Army's program while subject to criminal sentences that seriously constrained their liberty—a fact with which they ha[d] not come to grips in this litigation." *Id.* The Seventh Circuit found the other plaintiffs, which were "walk-in plaintiffs" did not fare any better because they "were free to leave at any time, and the Salvation Army was entitled to condition its provision of food, housing, and clothing to them on their continued satisfactory participation in the program." *Id.* at 1022.

7

Like in this case, the *Taylor* plaintiffs argued the Salvation Army used its rehabilitation programs as a "coercive labor arrangement that serves only the organization's financial interests" and brought a claim under the TVPRA. *Id.* at 1022. The Salvation Army's staff often reminded the participants that if they left the program, they would lose the food and shelter provided and the stakes were higher for participants on parole and probation—some of them were told their participation in the program, at least for some time, was mandatory. *Id.* at 1023. The staff told the justice-referred participants that if they didn't follow the rules, including working, they would be kicked out of the program and likely be incarcerated. *Id.*

In specifically analyzing whether the district court had properly granted a motion to dismiss as to the walk-in plaintiffs, the *Taylor* court noted that the "serious harm" alleged in the complaint was the Salvation Army's discontinuation of food, clothing, and shelter allowances, but the Court reasoned, those are "simply components of participation in the program" and the Salvation Army was "entitled to stop providing food, clothing, and shelter to someone who no longer wishes to participate." *Id.* at 1031. The Court further rationalized the Salvation Army could remind participants that leaving the program would result in the cessation of the benefits, because that was a legitimate warning and consequence. *Id.* The Court went so far as to find a "six-week long blackout period" at the beginning of the program where external communications were restricted for the participants and the ban on obtaining outside employment are "fairly standard in rehabilitation programs" and plaintiffs could have

8

regained their ability to do other work and access their cell phones by leaving the program early, "which they were always free to do." *Id.*

The *Taylor* court also emphasized the scienter requirement of the TVPRA—the Salvation Army must have intended that the worker believe that serious harm would befall them if they refused to work. *Id.* The Court reasoned "[a]s the district court stressed, given the voluntary nature of participation in the program, it is difficult to see how the Salvation Army could have harbored such an intent" and the complaint was devoid of allegations the Salvation Army had that intent. *Id.*

As to the second category of participants, the justice-referred participants, they are admittedly in a different situation as they were not voluntary participants and the Court reasoned they could not "expect to have the same freedom of choice with respect to their work and living conditions as individuals not subject to the legitimate penal objectives of the state." *Id.* at 1032.

Defendants highlight several aspects of the *Taylor* case, likening it to the instant set of facts. It is true that in *Taylor* and here, all plaintiffs were always free to leave. Defendants (like the defendants in *Taylor*) also argue the church was entitled to stop providing food and shelter if these plaintiffs left the program, and argue there is no plausible inference that the operator of a voluntary church program would intentionally make participants fear serious harm. [DE 16 at 9-10.] Ultimately, the majority judges in *Taylor* found a benevolent alternative explanation to the labor for the Salvation Army:

> The plaintiffs, and the dissent, nevertheless submit that the account set forth in the complaint tells a plausible story that the Salvation

>Army sustained its operation by preying on the most vulnerable in our society; it entrapped them in a coercive environment from which, as a practical matter, there was no realistic escape. There is an 'obvious alternative explanation,' however, for the Salvation Army's decision to seek out individuals dealing with homelessness, substance abuse, and issues with the criminal justice system. Those are the individuals most likely to choose to participate in, and to ultimately benefit from, the residential rehabilitation program.

*Id.* at 1032. In my opinion, this may be the largest distinguishing factor between *Taylor* and this case. In the amended complaint, Plaintiffs repeatedly allege threats of psychological harm and reputational harm. [DE 9 at 2-6.] These include manipulative tactics like shunning, shaming, doling out the silent treatment, telling the resident's family the resident was "in rebellion," displacing Bible study for more labor, losing their free time, and food control. [*Id.* at 2-5.] While the main harm alleged in *Taylor* was removal of the benefits of the program (which could have an arguably neutral explanation), in this case, there are allegations of real psychological threats and manipulation (which is much more insidious).

Moreover, as the Plaintiffs point out, the participants in *Taylor* signed up to do the labor—they knew about it in advance and knew it was part of the deal. Indeed, the Seventh Circuit described the Salvation Army program as "work therapy." *Taylor*, 110 F.4th at 1022. In sharp contrast, when I look at the amended complaint, which is really the universe of what I should consider on a motion to dismiss, there is nothing that suggests the women who were sent to Vision of Hope or started that program entered with the expectation they would be furnishing unpaid labor to Vision of Hope. The amended complaint alleges this was a *counseling program* where "[t]he women who

10

came to Vision of Hope, including Plaintiffs, were seeking help for problems." [DE 9 at 3.] And instead they found themselves cleaning, landscaping, and working in the retail store. This is even more eyebrow raising when one considers the allegation that Vision of Hope was paid hundreds of dollars per month by the families or churches of women sent to Vision of Hope. *Id.* Not only did these Plaintiffs not sign up for a program where they would be working in exchange for room and board, but their participation in the program was also paid for.

Another difference is that in this case, the women were in the program to be counseled. This counseling was not present in *Taylor* with the Salvation Army. This could, arguably, lead to a possibility of more psychological domination over the women in this case. "A victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude." *United States v. Kozminski*, 487 U.S. 931, 948, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). In the same way, these Plaintiffs' personal attributes and the fact that they were troubled and in need of counseling services supports the claim that psychological harm and reputational harm was a "serious harm" that they were susceptible to, and was used to compel forced, unpaid labor.

Defendants claim "shunning" and the other threats of losing relationships for the women are not actionable psychological or reputational harm under the TVPRA. [DE 16 at 13.] This is a motion to dismiss and factual issues are not to be determined on a motion to dismiss. *See Craftwood,II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 482 (7th

11

Cir. 2019). The facts as stated by Plaintiffs must be taken as true for purposes of a motion to dismiss, and they have alleged they were forced into unpaid labor by Vision of Hope's use of serious threats of psychological and reputational harm. *See Figgs v. GEO Group, Inc.*, No. 1:18-cv-89-TWP-MPB, 2019 WL 1428084, at *5 (S.D. Ind. Mar. 29, 2019) (denying motion to dismiss TVPA claim where Plaintiffs alleged sufficient facts and "whether that statute has been violated is a question for the trier of fact."); *see also Salcedo v. RN Staff, Inc.*, No. 1:21-cv-1161-SEB-DLP, 2023 WL 2403832, at *11 (S.D. Ind. Mar. 8, 2023) ("At this stage [on a motion to dismiss], we will not hold that alleged threats of deportation are always insufficient to constitute 'serious harm' within the meaning of a civil cause of action under the TVPA."). At this stage of the proceedings, the Plaintiffs have properly stated a viable claim for violation of the TVPRA. It will be up to the trier of fact to determine whether the alleged actions used against the women in the program qualify as threats of serious harm and actually violate the statute.

The other case championed by Defendants in support of the motion to dismiss is *Headley v. Scientology*, 687 F.3d 1173 (9th Cir. 2012). There, the Ninth Circuit affirmed summary judgment finding two married participants in the "Sea Org" (an elite religious order of the Church of Scientology which acts as the evangelical wing of the church), were not forced into unpaid labor by means of serious harm in violation of the TVPRA. The Ninth Circuit also affirmed the district court's ruling that the ministerial exception applied, noting the court should not scrutinize aspects of the minister-church relationship. *Id.* at 1181. First, Defendants have not claimed the ministerial exception

12

applies in this case.  Second, as noted by Plaintiffs, unlike the plaintiffs in *Headley* who "ma[d]e a symbolic one-billion-year commitment to serve the Church," they did not sign up to become a part of Defendants' church, they agreed to be customers at a resident counseling facility and receive counseling.  *Id.* at 1174.  And from the all-important procedural standpoint, *Headley* was decided on summary judgment (not at the dismissal stage like this case) and by an appellate court that is not controlling over this court.  The Plaintiffs in this case should also be able to conduct discovery and see if they can substantiate their claims that their labor was obtained by the threat of serious harm.

## Conclusion

For the aforementioned reasons, Defendants Vision of Hope Ministries, Inc., and Faith Church of Lafayette, Inc.'s motion to dismiss for failure to state a claim [DE 15] is DENIED.

SO ORDERED.

ENTERED: October 14, 2025.

                                           /s/   Philip P. Simon
                                           PHILIP P. SIMON, JUDGE
                                           UNITED STATES DISTRICT COURT