UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

HOSANNA MILLER, FAITH RUSSELL,
AND RACHEL MILLER, INDIVIDUALLY
AND ON BEHALF OF THOSE SIMILARLY
SITUATED,

      Plaintiffs,

v.

VISION OF HOPE MINISTRIES, INC.
AND FAITH CHURCH OF LAFAYETTE,
INC.,

      Defendants.

CASE NO. 4:25-cv-00033-PPS-JEM

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Respectfully submitted,

*/s/ Barry L. Loftus*
Barry L. Loftus    #20993-79
Jason W. Bennett #22895-79
Kirstie E. Klutzke  #38239-79
300 Main Street, Suite 900
Lafayette, IN 47901
Phone: (765) 423-1561
Fax: (765) 742-8175
Email: bll@stuartlaw.com
      jwb@stuartlaw.com
      kek@stuartlaw.com
*Attorneys for Defendants*

i

## CONTENTS

**Introduction** ............................................................................................................... 1

**Background** ................................................................................................................ 1

**Legal Standards**....................................................................................................... 5

**Argument** .................................................................................................................. 8

   1.  The putative class is not ascertainable. ........................................................... 8

   2.  23(a) Requirements........................................................................................ 11

       A.    Plaintiffs fail to establish numerosity. ................................................ 11

       B.    Plaintiffs fail to establish commonality.............................................. 13

            *i. The common question in this case impermissibly requires the Court to involve itself in VoH's religious practice.* ............................................... *18*

       C.    Plaintiffs fail to establish typicality. ................................................... 20

       D.    Plaintiffs do not establish adequacy of representation......................... 25

            *i. Miller and Russell are not adequate representatives.* ........................ *25*

            *ii. Plaintiffs' counsel is not an adequate representative.* ....................... *26*

   3.  23(b) Requirements........................................................................................ 30

       A.    Plaintiffs have not established the requirements of Rule 23(b)(3). ..... 30

            *i. Plaintiffs have not established predominance.* ................................... *30*

            *ii. Plaintiffs have not established superiority.* ...................................... *34*

   4.  Plaintiffs have not established the requirements of Rule 23(b)(1). ............... 36

**Conclusion** .............................................................................................................. 37

**Rules**

Federal Rule of Civil Procedure 23 .................................................................... passim

**Cases**

*Anderson v. Weinert Enters.*, 986 F.3d 773 (7th Cir. 2021)........................................ 13

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) ...................................................... 12

*Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374 (S.D. Ill. 2008).................. 6

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................................. 5, 6, 30, 33

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913 (7th Cir.

   2011) ....................................................................................................................29

*Eddlemon v. Bradley Univ.*, 65 F.4th 335 (7th Cir. 2023) ...........................................5

*Elliott v. ITT Corp.*, 150 F.R.D. 569 (N.D. Ill. 1992) ................................................. 18

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ................................... 7, 26, 36

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ............................. 6

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012).................... 7, 8

*Jackshaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.d. 183 (N.D. Ohio 1984)

   ...............................................................................................................................29

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) .......................................................... 21

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672 (7th Cir. 2009) .. 8

*Korte v. Sebelius,* 735 F.3d 654 (7th Cir. 2013) ........................................................ 19

*Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 67 (N.D. Ohio 1995)........................................ 28

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012)......... 30, 31

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) .................................................. 26

*Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. 2012).................................................... 7, 11

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006)................................... 8, 11, 21

*Our Lady of Guadalupe Sch., v. Morrissey-Berru*, 591 U.S. 732 (2020).................... 19

*Panwar v. Access Therapies*, 2015 U.S. Dist. LEXIS 7584 (S.D. Ind. 2015) ..... 6, 9, 10

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ............................................... 31

*Paul v. Watchtower Bible & Tract. Soc.*, 819 F.2d 875 (9th Cir. 1987....................... 19

*Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584 (7th Cir. 1993)..................... 5, 25

*Schroeder v. Progressive Paloverde Ins. Co.*, 146 F.4th 567 (7th Cir. 2025) ..... passim

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir.

   2022) ...................................................................................................... 19, 20

*Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750 (7th Cir. 2014) .................................. 14

*Sullivan v. Chase Inv. Services, Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978)....................... 28

*Szabo v. Bridgeport Machs., Inc.*, 199 F.R.D. 280 (N.D. Ind. 2001) ......................... 18

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001) ................................. 6

*Uhl v. Thoroughbred Tech., & Telecmcn's, Inc.*, 309 F.3d 978 (7th Cir. 2002).......... 25

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008).......................................... 32

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ...................................... 7, 8, 32

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................ passim

**Statutes**

18 U.S.C. § 1589.................................................................................................. passim

**EXHIBIT INDEX**

| | |
|---|---|
| A | Deposition of Hosanna Miller |
| B | Deposition of Faith Russell |
| C | Application (Miller) |
| D | Expectations for Residents |
| E | Program Structure |
| F | Intake (Miller) |
| G | Leaving the Program (Miller) |
| H | Release of Liability (Miller) |
| I | Admission Papers (Miller) |
| J | Intake (Russell) |
| K | Counseling Consent (Russell) |
| L | Leaving the Program (Russell) |
| M | Admission Papers (Russell) |
| N | Release of Liability (Russell) |
| O | Authorizations for Release of Information (Russell) |
| P | Exit Interview (Russell) |
| Q | Affidavit of Rod Hutton |

## INTRODUCTION

Come now Defendants Vision of Hope Ministries, Inc. and Faith Church of Lafayette, Inc. ("collectively, "Defendants"), for this Response to Plaintiffs' Motion for Class Certification.

Plaintiffs' Motion for Class Certification falls short of Rule 23's standards for several reasons. Foremost is Plaintiffs' consistent treatment of Rule 23 as a mere pleading standard—simply reciting the Rule's requirements back to the Court without analysis, and often without even supporting evidence. The Supreme Court has repeatedly explained that class-action proponents must offer more than conclusory allegations in order to "affirmatively demonstrate" that they meet Rule 23's strict standards. But all Plaintiffs have provided this Court is their own say-so.

The substantive aspects of Plaintiffs' Motion fail to satisfy any of the elements required for a Rule 23 class action, and also raises issues that would require the Court to impermissibly inquire into matters of religious doctrine and practice. Plaintiffs have failed to carry their burden, and class certification should be denied.

## BACKGROUND

Faith Church of Lafayette, Inc. ("Faith") is a Christian Baptist church located in Lafayette, Indiana, that has been in operation since 1964.[1] In 2008, Faith opened and began operating Vision of Hope Ministries, Inc. (VoH), a residential facility that provides biblical counseling to women of all ages. *Id.* On the VoH website home page,

---

[1] https://www.faithlafayette.org/church/about/history

1

VoH describes its program as being "Christ-centered, Bible-based, and is designed to help ladies who desire to change and to serve Jesus Christ."[2] The website also provides that "residents will also regularly serve and build job skills at Vision of Hope's up-cycling retail shop, Reclaimed Hope, LLC," and includes a first-day sample schedule that references chores and meal preparation. *Id.*  The application for residency is housed on VoH's website. *Id.*

Named Plaintiff Hosanna Miller was living in North Carolina when she first learned about VoH from people within her social circle. Ex. A, 34:13–36:10. At the time, Miller was receiving Christian counseling with Door of Hope Ministries, but hoped VoH would assist her in working through additional mental health issues. *Id.* 36:11-24, 39:10-14. Miller knew VoH was a religious organization. *Id.* 39:23–40:10. After reviewing VoH's website and talking with VoH staff, Miller filled out the application for residency on August 1, 2021. Ex. C. The application included several documents for the applicant to review, including a document titled "Expectations for Residents During Phase One," (Ex. D) which in part describes VoH's "ministry to others" program component, a critical part of the treatment program. *Id.* p. 5. Ministry to others is VoH's volunteerism element, where the residents "volunteer[ ] in the different departments of Faith Ministries as well as other local agencies around the community." *Id.* The document also includes that residents will serve 4-20 hours per week at Reclaimed Hope to learn valuable life and vocational skills, and that residents will participate in daily upkeep of the house which includes cleaning

---

[2] https://www.faithlafayette.org/voh

assigned rooms, assisting with house laundry, and participating in weekly chore projects. *Id*. pp. 6, 8.  The application also included the document "Vision of Hope Program Structure," which again mentions residents will work at Reclaimed Hope. Ex. E.

After filling out the application with assistance from her pastor and foster parent, Miller did an intake interview with VoH intern, Sydney Hopkins, on August 2, 2021. Ex. F. On August 5, 2021, Miller reviewed and signed the document "Leaving the Program (Adult  Residents)," which states "We <u>NEVER</u> force anyone to stay at Vision of Hope against their will," and states that if a resident wishes to leave, she will be encouraged to stay, but will be permitted to leave if she is determined to do so. Ex. G. The document also indicates that VoH may dismiss residents for a variety of reasons. *Id.*

Finally, after reviewing the website, filling out the application, completing her intake interview, and executing additional documents, Miller drove herself to VoH on September 2, 2021 to begin her residency. *Id.*, 37:21 – 41:11. Upon arriving, Miller executed additional documents, including a "Release Agreement" (Ex. H) and "Admission Papers" in which Miller acknowledged was admitting herself into VoH willfully and voluntarily, and that she could leave the program at any time (Ex. I).

Miller's time at VoH included both success and turmoil. Miller progressed in the program and was able to get a job at Cracker Barrell in December of 2022, and which she still held at the time of her deposition on March 21, 2026. Ex. A, 268:8–269:8. Miller was able to drive herself to and from work. *Id.* Eventually, Miller

3

progressed to being able to live out of the house and lived with the Tyler family who were members of the church. *Id.* 227:21–228:19. Miller also left VoH for weeks at a time for things like Covid-19 leave and family vacation out of the country. *Id.* 124:7–162:15, 140:1–141:18, 252:13–253:4. However, Miller also faced discipline for things like lying, causing property damage to the VoH property, and threatening to kill her counselor. *Id.* 178:2–179:11, 180:24–184:6, 195:7–197:12. Miller voluntarily left VoH on January 22, 2024. *Id.* 152:24–153:9.

Named Plaintiff Faith Russell came to VoH just a few months after Miller, in December 2021. Ex. B, 83:22–84:1. Russell first learned of VoH from her parents, who gave her an ultimatum to either go to VoH, or stay living at home until she turned 19 years old. *Id.* 52:13–53:16. Like Miller, Russell also "looked through the entire website," and saw that biblical counseling would be utilized in the program. *Id.* 54:9-20. Russell knew VoH was a Christian religious organization, and that the principles, teachings, and rules at VoH were centered on religion. *Id.* 61:4–64:15. Russell had her intake call with VoH intern Sydney Hopkins on November 24, 2021. Ex. J.

Upon arriving at VoH on December 30, 2021, Russell executed additional documents including a "Counseling Consent" form, which states in part,

> I understand [VoH] is owned by Faith Church and operates as part of a training facility. [VoH] cooperates with Faith Biblical Counseling Ministries and Faith Bible Seminary. I understand that [VoH] use the Bible as the sufficient and authoritative source of truth in all Biblical counseling.

Ex. K. Russell also executed a form called "Leaving the Program" which states "We NEVER force anyone to stay at Vision of Hope against their will," (Ex. L),

"Admission Papers" that verify Russell was coming to VoH willfully and voluntarily (Ex. M), and a "Release Agreement" (Ex. N). Russell also executed several different "Authorizations for Release and Disclosure for Confidential Information" which listed her family members and her church pastor (Ex. O). Russell was dismissed from the program on April 1, 2022, after just three months, for breaking program policies. Ex. P.

Both Miller and Russell were unequivocally and abundantly clear that they knew VoH was a religious program which included an unpaid service requirement. Ex. A, 39:23–40:10, 74:14–75:9; Ex. B, 54:9-20, 61:4–64:15, 172:13–173:20.

## LEGAL STANDARDS

*a. Legal Standard for Class Certification under Fed. R. Civ. P. 23*

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. A party seeking to obtain class certification under Rule 23 bears the burden of establishing the numerosity, commonality, typicality, and adequacy of representation requirements, and must satisfy at least one of Rule 23(B)'s provisions "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal citations omitted). Failure to satisfy any one of these elements bars certification. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993). Where certification is sought under Rule 23(B)(3), "common questions of law or fact must predominate over individual inquiries, and class treatment must be the superior method of resolving the controversy." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023).

5

Rule 23 does not set forth a mere pleading standard. Rather, the party seeking certification must "affirmatively demonstrate" their compliance with the Rule—that is, they "must be prepared to prove that there are in fact sufficiently numerous parties, common questions or law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275, 134 S. Ct. 2398, 189 L. Ed. 2d 339 (2014) (emphasizing that parties seeking class certification may "not simply plead ... that their proposed class satisfies each requirement of Rule 23."). Actual, not presumed, compliance with Rule 23 is indispensable. *Wal-Mart*, 654 U.S. at 351.

In deciding whether to certify a class, the court is not required to take Plaintiffs' allegations as true, and the judge should make whatever factual and legal inquiries are necessary under Rule 23. *Panwar v. Access Therapies*, 2015 U.S. Dist. LEXIS 7584, *6 (S.D. Ind. 2015) (*citing Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001)). Thus, courts may have to "probe behind the pleadings" in order to decide on the question of certification. In evaluating class certification, the Court must take into consideration the substantive elements of the plaintiffs' cause of action, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would take. *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 377 (S.D. Ill. 2008).

Then, certification is proper only "if the trial court is satisfied, after a rigorous analysis, that [Rule 23's] prerequisites have been satisfied." *Comcast*, 569 U.S. at 27-28. This rigorous analysis will often overlap with the merits of the underlying claim

because a class determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 654 U.S. at 351.

The principal purpose of class certification is to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical manner. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982). In keeping with this principal purpose, Rule 23 gives district courts "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Olson v. Brown*, 284 F.R.D. 398, 404 (N.D. Ind. 2012).

b.  *Legal Standard for "Forced Labor" under 18 U.S.C. § 1589.*

The Trafficking Victims Protection Act (TVPA) was enacted by Congress to "combat the transnational crime of trafficking in persons." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1178 (9th Cir. 2012). Specifically, the TVPA was intended to "address serious trafficking, or cases 'where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.'" *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

The TVPA makes it a crime to knowingly "obtain the labor or services of a person" by means of force, threats of force, means of serious harm, or threats of serious harm. 18 U.S.C. § 1589(a). "Serious harm" under the TVPA means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel

7

a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* at (c)(2). The TVPA "requires that serious harm befall the employee 'if she did not continue to work' or a threat that 'compels her to remain' with the employer." *Headley*, 687 F.3d at 1180 (*citing Dann*, 652 F.3d at 1170). In addition, there is a scienter requirement—the employer must have intended to cause the victim to believe they would suffer serious harm if she did not continue the work. *Dann*, 652 F.3d at 1170.

## ARGUMENT

### 1. The putative class is not ascertainable.

The putative class lacks ascertainability because it is overly broad and includes women who have not suffered the same specific harms as Plaintiffs, or suffered any harm at all. A party seeking class certification must make a threshold showing that the class is identifiable. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). A class definition, then, must be definite enough that the class can be ascertained. *Id.* A class that would include many people who have suffered no injury at the hands of the defendant is overbroad and lacks the definiteness required for ascertainability. *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677-78 (7th Cir. 2009).

Critically, in this case, liability under the TVPA requires an inquiry into each woman's experience working as a volunteer and performing ministry to others. And, because the women knew the ministry to others was part of the treatment program,

8

the inquiry hinges on whether each woman suffered a specific harm that overcame her ability to leave VoH.

Plaintiffs propose the following class definition: "All individuals who participated as residents of Vision of Hope's residential counseling program in the past ten years." DE 27, p. 4.

This class definition is improperly overbroad. The definition does not include only women alleging to have suffered the same violations of law or same specific harm as the named Plaintiffs, such as reputational harm or psychological harm. Rather, the definition includes women who, for example, were residents at VoH for a day and left without performing any ministry to others, women who wanted to participate in the ministry to others, women who performed the ministry to others for reasons unrelated to any alleged threats of harm, women who did not feel compelled to stay at VoH and left on their own accord, women who did not feel compelled to stay at VoH but wanted to stay, women who were kicked out of VoH's ministry for various reasons, and women who had not been injured at all.

This class definition includes, without discrimination, every person who entered VoH's program in the last ten years, improperly assuming that every woman who walked through the doors at VoH was automatically harmed just by way of being present there. This sort of contention and class definition does not pass muster and has been rejected in similar TVPA cases. *See Panwar*, 2015 U.S. Dist. LEXIS 7584 (rejecting Plaintiff's class definition that would assume every employee of Defendants who signed an unenforceable promissory note was damaged; "[w]ithout some

additional actions by the Defendants, these employees would not have suffered damages simply due to the existence of the promissory note enforceable upon breach of the employment agreement."). Each woman's attendance at VoH Ministries, by itself, has not caused them harm, and the proposed class definition which assumes as much, is impermissibly overbroad and must be rejected.

Plaintiffs' proposed class definition is similarly untethered to any claims made by Plaintiffs and is likewise impermissible. "[A] proper class definition cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury." *Id.* at *9. Again, *Panwar* is demonstrative of this point. Like here, the *Panwar* plaintiffs brought a claim under the TVPA, alleging that the defendants forced employees to work for them by means of threats of serious financial harm and/or threats to their immigration status. *Id.* at *8. The *Panwar* Court found the proposed class definition was overbroad, bearing "little connection to the claims in this case…and cast[ing] a very wide net to include virtually all former and current employees of the Defendants, whether or not they remained employed with Defendants because of the alleged threat of harm…." *Id.* at *8-9.

The same can be said here. Although Plaintiffs allege they suffered psychological and reputation harm by way of things like alleged shunning, being given consequences, and being labeled in rebellion if they left the program early (*see generally* DE 9), Plaintiffs' proposed class definition has no connection to those claims, or to the elements underlying a TVPA claim. The class definition casts a wide net

that includes literally all former residents of the past decade, regardless of whether they remained at VoH or performed the ministry to others because of the alleged threats of harm. Such a definition produces a class that is not sufficiently identifiable or definite, and class certification should be denied.. *See also Oshana*, 472 F.3d at 513-515 (affirming the district court's denial of certification because the class definition was improperly broad so as to include even people who had not been injured.).

### 2. 23(a) Requirements

A. Plaintiffs fail to establish numerosity.

The first requirement of Rule 23(a) is that the putative class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is broken down into two components: the number of the putative class members, and the impracticability of joinder. *Id.* A party seeking class certification cannot rely on "mere speculation" or "conclusory allegations" as to the size of the putative class to prove that joinder is impractical. *Olson v. Brown*, 284 F.R.D. 398, 407 (N.D. Ind. 2012).

Here, Plaintiffs begin by providing that, "based on the testimony gathered" in a separate case, it is believed there will be "100 or more" members of the putative class because, "in the 10 years there have been more than 100 residents of Vision of Hope." DE 27, p. 4. Plaintiffs provide no documentation or evidence whatsoever to

11

support this statement.[3] "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties… ." *Wal-Mart*, 654 U.S. at 350. Plaintiffs' unsupported statement that the putative class is expected to be "100 or more" is the exact type of speculative, "conclusory allegation" that the federal courts have deemed insufficient for a showing of numerosity. *E.g.*, *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) ("the party supporting the class cannot rely on 'mere speculation' or 'conclusory allegations' as to the size of the putative class to prove that joinder is impractical for numerosity purposes.").

Besides being speculative, Plaintiffs' number is also based on their impermissibly overbroad class definition that includes even women who were not specifically harmed. Because Plaintiffs use this improper class definition to form their numerosity estimate, the number of putative class members is likely far less than that alleged by the Plaintiffs.

By failing to support their alleged number of putative class members with any documentation or evidence, and by basing their estimated putative class member size off of their impermissibly overbroad class definition, Plaintiffs have failed to prove

---

[3] Plaintiffs also erroneously state that Defendants failed to answer discovery "requesting the number and identity of the individuals meeting the class criteria." DE 27, p. 4. Defendants answered Plaintiffs' discovery requests several times over before Plaintiffs filed their Motion for Class Certification: First on 9/12/25, then supplemented on 12/17/25 (including the past 10 years' worth of resident names and their reasons for leaving the program), then supplemented again on 2/10/26 (including the dates of attendance, and last known phone numbers and addresses for the residents identified in the first supplement). It is unclear why Plaintiffs represented to the Court that this information was not provided by the time Plaintiffs filed their Motion for Certification on 2/14/26, four days after the second supplement.

their burden of proof that the putative class is sufficiently numerous under Rule 23(a).

Impracticability of joinder is the second required component of numerosity. "The key numerosity inquiry under [the Rule] is not the number of class members alone but the practicality of joinder." *Anderson v. Weinert Enters.*, 986 F.3d 773, 777 (7th Cir. 2021). Although impracticable does not mean impossible, the class representative must show it is extremely difficult or inconvenient to join all members of the class. *Id.* at 775. Mere allegations that a class action would make litigation easier for the plaintiffs are not enough to satisfy the numerosity requirement. *Id.* Rather, the question of practicability of joinder requires "evaluation of 'the nature of the action, the size of the individual claims, and the location of the members of the class…." *Id.* at 777. Plaintiffs wholly neglect that component of numerosity, failing to address it at all in their Motion. That failure is fatal to a showing of numerosity because, again, "the key numerosity inquiry" is not just the number of putative class members, but the impracticability of joinder. *Id.* at 777. For these reasons, Plaintiffs have failed to prove numerosity and their Motion for Class Certification should be denied.

B.  Plaintiffs fail to establish commonality.

Plaintiffs have not designated any common questions that can be answered with class-wide proof, and therefore fail to establish commonality.

"Commonality" is a showing of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although even one common question will do, "it is easy to

misread" the language of Rule 23(a)(2) to require just any common question, "since any competently crafted class complaint literally raises common 'questions'." *Wal-Mart,* 564 U.S. at 349. But commonality does not hinge on reciting just any question; a common question must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Further, a question satisfies commonality if "the same evidence will suffice for each member to make a prima facie showing [on the question] or the issue is susceptible to generalized, class-wide proof." *Schroeder v. Progressive Paloverde Ins. Co.,* 146 F.4th 567, 573 (7th Cir. 2025).

To show commonality, it is not enough to merely ask whether all plaintiffs suffered a violation of the same provision of law. "Reciting [such] questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart,* 564 U.S. at 349–50 (internal quotations omitted). "The critical point is 'the need for conduct common to members of the class.'" *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750 (7th Cir. 2014). And again, commonality does not follow a pleading standard: "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions or law or fact, etc. … ." *Wal-Mart*, 564 U.S. at 350.

14

Plaintiffs propose just one "common question" to satisfy the commonality requirement: "whether Defendants obtained the forced labor of the residents at Vision of Hope…" DE 27, p. 5. This question is insufficient in that it simply asks whether Defendants violated the same provision of law as to each Plaintiff and class member, not whether they suffered the same injury or specific harm.

The Supreme Court has expanded on the scope of common questions specifically. In *Wal-Mart*, the Plaintiffs alleged sex-based discrimination under Title VII. 564 U.S. 338 (2011). The Court explained that Title VII can be violated in a number of ways, such as "by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company." *Id*. at 350. Thus, "the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can be productively litigated at once." *Id*. Instead, the Court stated, "their claims must depend on a common contention," such as "the assertion of discriminatory bias on the part of the same supervisor." *Id*.

Plaintiffs' proposed common question has no such "common contention" of fact; it asks only whether all Plaintiffs and class members suffered a violation of the same provision of law, not the same specific harm. As *Wal-Mart* explains, such a question is too vague and broad, lacking any specificity to suggest that all the class members claims can be productively litigated at once.

15

But even if the question were deemed sufficient on its face, the commonality requirement also demands that the question be "susceptible to generalized, class-wide proof," and be able to be answered using "the same evidence" for each class member. *Schroeder,* 146 F.4th at 573. Plaintiffs' own affidavits attached in support of their Motion for Certification demonstrate that their "common question" is not susceptible to class-wide proof, nor can it be answered using the same evidence for each class member. This is especially true as to the critical issue of how each woman responded to the ministry to others element of the program.

Each affidavit includes the ways that specific affiant felt wronged by VoH and importantly, every specific "harm" is different from person to person. For example, Vanessa Johnson contends part of her harm was that her "counselor would often act as though my trauma did not matter," or that she was suspected to be engaging in binge and purging behaviors because of the weight she lost during her time as a resident. DE 27-1, ¶¶ 11, 18. Affiant Ashley Fritsch alleges she was "harmed" by receiving consequences for not following program policies, and takes issue with how long it took to complete those consequences. *See generally* DE 27-2, ¶¶ 23, 25. She also alleges part of her harm occurred when VoH did not permit her to get a job when she wanted. *Id.* ¶ 22. Affiant Anne Stewart's "harms" include being told that leaving the program early would be "against counsel." DE 27-3, ¶ 13. In any event, although the affiants and Plaintiffs all allege the "threats" of harm and actual harm compelled them to perform the ministry to others, there is a wide logical gap between the "harms" they allege and establishing compulsion to perform labor. In addition, the

affiants present no evidence as to how such perceived harms prevented them from leaving.

Those affidavits also undermine Plaintiffs' required showing: because every person's alleged harm stems from different events and experiences, there is no "generalized, class-wide proof" that can answer the question, "whether Defendants obtained the forced labor of the residents at Vision of Hope…" *Schroeder,* 146 F.4th at 573. There is no commonality to their allegations.

Instead, multiple individualized inquiries would be required to answer Plaintiffs' proposed common question. Those individualized inquiries would include, at minimum:

(1) what type of "harm" was used against you (physical, nonphysical, psychological, reputation, actual or just the threat thereof),

(2) who at VoH did the harm,

(3) what dates were the harm done,

(4) was the harm "sufficiently serious" as contemplated by the statute,

(5) how did the harm compel you to perform the labor, and

(6) how did the harm keep you from leaving?

In addition, although Plaintiffs use the term "forced labor" in their common question, Plaintiffs do not explain what "forced labor" means, nor do they give any argument or opinion as to what degree of ministry to others is acceptable, and what degree crosses the threshold into "forced labor." Thus, in addition to the individualized questions offered above, further individual inquiry would be needed to ascertain how each class member draws the line between ministry to others and

"forced labor." These individual inquiries are all required to answer the purportedly common question of "whether [VoH] obtained the forced labor of the residents at Vision of Hope." DE 27, p. 5. However, there is no evidence to even support these individualized questions because, as Miller and Russell testified, they were free to leave at any time and thus there can be no "forced labor." Ex. A, 58:12-20; Ex. B, 233:6–234:8.

But more importantly, to answer these individualized questions, the Court would necessarily have to wade into matters of religion.

> i. *The common question in this case impermissibly requires the Court to involve itself in VoH's religious practice.*

The Supreme Court has recognized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. *Wal-Mart*, 564 U.S. at 350-351. A court should also consider the substantive elements of plaintiffs' claims and the proof necessary to those elements, so as to envision the form a trial would take. *Szabo v. Bridgeport Machs., Inc.*, 199 F.R.d. 280, 301 n.2 (N.D. Ind. 2001) (*citing Elliott v. ITT Corp.*, 150 F.R.D. 569, 572 (N.D. Ill. 1992)). As discussed above, to evaluate whether Plaintiffs' "common question" is sufficient to establish commonality, and to evaluate whether common questions of law and fact predominate (which discussion is had later in this brief), several individualized inquiries are required into each of the harms alleged by the Plaintiffs and class members. Because essentially all the conduct or harms Plaintiffs complain of— stringent regulations, ministry to others, discipline, shunning, the practice of

declaring departed residents "in rebellion,"—are religiously motivated, the individualized inquiries require the Court's assessment of VoH's religious practice.

The consequences implemented by VoH are foundationally based on submitting to God and authority, and the consequences included things like studying certain Bible verses. Ex. A, 191:22–192:7; Ex. B, 78:12–80:12. As to the alleged shunning, this is an inherently religious concept which is protected under the Free Exercise Clause (*see Paul v. Watchtower Bible & Tract. Soc.*, 819 F.2d 875 (9th Cir. 1987)). And finally, "rebellion" is a biblical term and concept, which is acknowledged by both named Plaintiffs in their depositions. Ex. A, 88:19 – 91:8; Ex. B, 42:10 – 43:22.

Religious entities are protected by the First Amendment's ministerial exception and church autonomy doctrine. The ministerial exception includes in its purview any employee who leads a religious organization, or serves as a messenger or teacher of its faith. *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 939 (7th Cir. 2022). On the other hand, the church autonomy doctrine protects against government interference in faith and doctrine and matters of church government. *Our Lady of Guadalupe Sch., v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Secular courts may not interpret religious law or wade into religious disputes, and must respect religious institutions' autonomy to shape their own mission, conduct their own ministries, and generally govern themselves in accordance with their own doctrines a religious institutions. *Korte v. Sebelius, 735 F.3d 654, 677 (7th Cir. 2013).* VoH, by and through its staff, conducted its program according to its own mission, faith, and religious beliefs. Inquiry into VoH's practices concerning these

19

matters is impermissible government interference with VoH's religious principles, doctrine, and the practice of its religion, and violates VoH's First Amendment rights. *Starkey,* 41 F.4th 931. To the extent the Plaintiffs ask the Court to weigh the facts concerning the requirements for ministry to others, program discipline, and alleged shunning, all which are based on biblical principles and church governance, the First Amendment bans such inquiry.

Finally, Plaintiffs allege in their Motion to Certify that VoH had a "pattern and practice" of obtaining the alleged forced labor of the ministry's residents. But again, they provide no proof of this "pattern and practice"; they offer only their conclusory assertion, in defiance of *Wal-Mart*'s admonition that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350.

The question proffered by Plaintiffs is not susceptible to generalized, class-wide proof, would require individual evidence and inquiries for each class member, would require governmental interference into church governance and religious practice, and thus does not satisfy the commonality requirement. *Schroeder,* 146 F.4th at 573. Because Plaintiffs have put forth no other common questions of law or fact, Plaintiffs have failed to affirmatively establish strict compliance with Rule 23(a)(2), and class certification must be denied.

C. Plaintiffs fail to establish typicality.

Plaintiffs likewise fail to prove typicality. "A claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of the other class members and…her claims are based on the same legal theory." *Oshana,* 472

20

F.3d at 514. This requirement is meant to ensure that the named plaintiff's claims "have the same essential characteristics as the claims of the class at large." *Id.*

Once again, Plaintiffs treat their Rule 23 evidentiary burden as a mere pleading standard. Their Motion for Certification offers nothing more than the bare conclusion that Plaintiffs claims are typical of the class because "the claims stem from a common nucleus of operative facts and are based upon the same legal theory." DE 27, pp. 5-6. Plaintiffs provide no evidence or argument on this point—no explanation, let alone evidence, of the alleged "common nucleus" of facts or the "legal theory" they purportedly share. As *Wal-Mart* makes clear, Plaintiffs' threadbare "pleading" does not satisfy Rule 23's rigorous requirements. 564 U.S. at 350. This deficiency by itself is enough to deny certification.

Deficient argument notwithstanding, the named Plaintiffs' claims cannot be typical of the class because (1) Plaintiffs' claims are not even typical of each other, (2) they do not arise from a common nucleus of operative fact as the claims from the putative class members. A common nucleus of operative fact exists where a defendant has engaged in standard conduct toward members of the class. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The depositions of named Plaintiffs Miller and Russell demonstrate that they cannot clear either of those two hurdles.

At the threshold, their claims are not even typical of each other. In the Amended Complaint, Plaintiffs alleged that "[r]esidents often felt afraid to leave or unable to leave" because of threats of psychological or reputational harm. DE 9, ¶¶ 44-45. In her deposition, Miller testified that she wanted to leave VoH, but felt like

21

she couldn't, due to the alleged harms and threat of harms. *See* Ex. A, 55:12—56:24 , 152:21–23, 156:18–158:9. Although, Miller conceded she could have left at any time and did eventually leave VoH on her own accord. *Id.* 55:12–56:24, 57:1–58:20, 152:24–153:9, 202:13–205:2. But for Russell, she testified she did not even want to leave the program—she wanted to stay, because she did not want to return home. Ex. B, 76:18–78:6. Unlike Miller, Russell stayed because she did not want to leave, and she performed the ministry to others because it was a condition of staying. And again, in contrast to Miller, Russell was kicked out of the program after three months for failing to follow program policies. Ex. B, 247:9-248:16; Ex. P. This aspect of Russell and Miller's claims are diametrically opposed to each other, not "typical."

Not only are Russell and Miller's claims on whether they wanted to leave VoH not typical of each other, but the harms Russell and Miller allege in their depositions are also atypical because they do not arise from a common nucleus of operative fact shared between themselves, or shared with any other class members. For example, Miller and Russell both allege that "shunning" constituted threats of reputational harm and psychological harm. Miller alleged the following constituted "shunning" as it pertains to her: people not wanting to eat breakfast with you in the morning or walk the track with you (Ex. A, 212:10–19), being avoided by other residents for not following the rules of the program (*id.* 109:12–110:2), counselor Heather Starkweather being "rigid," "cruel," and "harsh" to her (*id.* 110:3–6), being asked not to talk with people when attending church service during the program (*id.* 110:18–111:4), and the members of Faith Church in Indiana choosing not to associate with

22

her after she left (*id.* 206:1–207:17). Miller's proffered "shunning" examples are experiences unique to her—and entirely subjective at that. Miller identified no "policy and practice" as alleged in the Motion for Certification, nor any conduct by Defendants that was directed toward the entire class. Thus, Miller's examples of "shunning" as a harm cannot come from a common nucleus of operative fact shared with Russell or the putative class members because these are her individual experiences and her subjective analysis thereof.

Likewise, Miller identified the following as "reputational harm": counselor Heather Starkweather whispering about Miller to Starkweather's husband—despite not knowing what was said (*id.* 264:5-265:4), Starkweather avoiding contact with Miller after Miller left VoH (*id.*), Starkweather being "angry" or "hostile" and "instead of asking good questions, she would just jump to conclusions" (*id.* 173:11-25), Starkweather "talk[ing] ill" about Miller "to [Starkweather's] friends," although Miller could not identify what Starkweather said to any person about her (*id.* 174:1–175:11), and Nicky Barnhizer, Dr. Hodges, Heather Putney, and Karen Travis making statements about Miller although again, Miller could not identify what any of those staff allegedly ever said about her (*id.* 215:1 – 216:19). Again, these are experiences unique to Miller, not to Russell or the rest of the class, and hinge on Miller's subjective interpretation thereof. These claims are not and cannot be considered typical of the class.

Russell's examples of shunning and "reputational harm" are, in a nutshell, that her counselors informed her they intended to share her progress with her parents

23

and church, and that her counselor called her parents to tell them Russell was dismissed.[4] Ex. B, 84:10–85:11, 236:21–238:9, 241:13–242:5, 245:19–246:8. Again, Russell has not identified any conduct by Defendants that was directed toward any other class member, and instead identified only experiences unique to her, and which she has subjectively interpreted.

The affidavits filed in support of Plaintiffs' Motion for Certification again underscore this point. Each affidavit details different examples of how each affiant felt they were harmed. *See generally* DE 27-1 – 5. Every single example of "harm" differs from one person to the next, and from the named Plaintiffs. There is no one common thread, no single event (or even one single *type of* event) that gives rise to the class members' claims. Every instance of "harm" is unique to that individual affiant, and has been subjectively interpreted by them. The inherent subjectivity of those claims demonstrate that there can be no common nucleus of operative fact and thus no typicality between the named Plaintiffs, between putative class members, or between putative class members and the named Plaintiffs.

Nor are Russell's and Miller's claims that VoH used threats of harm to compel the residents to comply with VOH's "demands for unpaid, forced labor" common to the class. DE 9, ¶ 62. Neither Russell nor Miller could identify, specify, detail, or pinpoint any instance where they objected to the ministry to others while residents at VoH, except to other residents (Ex. A, 156:18–158:9, 237:10–23, 275:9–277:20,

_____

[4] Notably, Russell executed releases for VoH to communicate with her parents and church while she was in the program and never revoked that permission. Ex. O.

24

278:23; Ex. B, 198:1–200:7, 221:14–24)—nor that they were told they'd be subjected to harms if they failed to do the ministry to others (Ex. B, 265:13–23). The inability to identify even a single instance where Russell and Miller were told they would suffer harm if they did not continue to work is in contradiction to the class claims. Miller and Russell's claims are therefore not typical of what they claim binds the rest of the class together, and certification should be denied.

D.  Plaintiffs do not establish adequacy of representation.

i.    *Miller and Russell are not adequate representatives.*

Adequacy of representation has two requirements: first, class representatives must be able to fairly and adequately represent the class, and (2) the attorney(s) for the plaintiffs and class must adequately represent the party. Fed. R. Civ. P. 23(a)(4). Neither prong is met here.

As to the first component, class representatives must "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech., & Telecmcn's, Inc.*, 309 F.3d 978, 984 (7th Cir. 2002). A class is not adequately represented if class members have antagonistic or conflicting claims. *Retired Chi. Police Ass'n*, 7 F.3d at 596. In what is a recurring theme, Plaintiffs' argument as to Miller's and Russell's adequacy as class representatives is no more than conclusory statements asserting that there's no reason to believe Russell and Miller have claims antagonistic to the class, and that they have a sufficient interest in the outcome of the lawsuit. DE 27, p. 6. Again, these conclusory statements are "mere pleading" that cannot meet Rule 23's standard. *Wal-Mart*, 564 U.S. at 350.

However, conclusory statements aside, the named Plaintiffs are not proper party representatives for the same reason there is no typicality or commonality: They have not suffered the same injuries of the class—*i.e.*, there is no common nucleus of operative fact among Plaintiffs' claims and the class claims. Because there is no common nucleus of operative fact, Plaintiffs' claims are not typical of the class, as discussed above. The Seventh Circuit has held that, "[i]f a plaintiff's claim is atypical, he is not likely to be an adequate representative." *Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) (*citing Falcon*, 457 U.S. at 157).

It is also unlikely Miller and Russell suffered an injury at all—the TVPA requires that a plaintiff must have felt they were not free to leave. 18 U.S.C. § 1589. Miller acknowledged she could have left at any time, and Russell acknowledged she did not even want to leave. Ex. A, 57:1–58:20; Ex. B, 76:18–78:6.

And finally, Miller and Russell's own behavior while at VoH casts doubt on whether they can be adequate representatives of the class—Miller, for threatening to kill her counselor, and Russell for getting dismissed for lying and stealing. Ex. A, 195:7-16, 197:10-12; Ex. P. Miller and Russell cannot adequately represent class members who followed the policies of the program, who did not threaten violence on Defendants, or who did not get kicked out of the program for lying and stealing.

Because Miller and Russell's claims are not typical of that of the class, and because Miller and Russell have not suffered the same injury as the class members, they are not adequate representatives and certification should be denied.

ii.    *Plaintiffs' counsel is not an adequate representative.*

Plaintiffs also fail to show that their counsel would be an adequate class representative. In making that determination, courts must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). In addition, courts may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

At the outset, the Court cannot even begin the adequacy inquiry under Rule 23, because Plaintiffs have provided no information for this inquiry. Indeed, they have barely offered even "mere pleading," *Wal-Mart*, 564 U.S. at 350, on that point— only a single sentence to demonstrate that their counsel is an adequate representative of the class: "[C]ounsel for Plaintiff has devoted fifteen years to litigating on behalf of victims of civil rights violations and employment abuses, including administration of class and collective actions." DE 27, p. 6. Plaintiffs have not stated what work counsel has done in identifying and investigating the claims, have provided no specifics regarding counsel's experience with class actions (including but not limited to how many class actions he has litigated or the claims therein), have not provided information regarding counsel's knowledge of this very niche legal claim, nor have provided any information regarding counsel's resources to prosecute this action (which is especially important as Plaintiffs' counsel is a solo

practitioner). The failure to provide any concrete information pertinent to the Court's Rule 23(a)(4) analysis in itself warrants denial of certification.

But there is, though, other relevant information this Court should consider for its analysis under this section. Plaintiffs' counsel represents another group of plaintiffs in a putative collective action against the same defendants, Vision of Hope Ministries and Faith Church of Lafayette, for claims under the Fair Labor Standards Act (FLSA). That collective action, case number 4:24-00053, was conditionally certified on June 5, 2025 by this Court. In both the FLSA collective action and this class action, the putative class is seeking monetary damages. The pursuit of money damages from the same defendants on behalf of two separate groups of plaintiffs presents an inherent conflict of interest for Plaintiffs' counsel, where an award of damages or settlement for one class of clients necessarily takes from and reduces the amount of funds available to pay an award of damages or settlement to the other.

For that reason, numerous courts in the class action context have found similar arrangements to be an insurmountable conflict of interest, where the same counsel represented different plaintiffs against the same defendant in parallel actions. *E.g.*, *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 67 (N.D. Ohio 1995) (finding counsel's representation of two groups against the same defendants in parallel actions an "intolerable conflict of interest"); *Sullivan v. Chase Inv. Services, Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978) (barring counsel's representation of different plaintiffs in parallel actions against the same defendant because it was an impermissible conflict of interest); *Jackshaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.d. 183, 192

(N.D. Ohio 1984) ([t]he responsibility of class counsel … does not permit even the appearance of divided loyalties of counsel"). Simply put, the divided loyalty of counsel between two clients against the same defendant is impermissible. This Court should follow *Kurczi*, *Sullivan*, and *Jackshaw Pontiac* and find the same here.

Because the Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), the Court should also consider Plaintiffs' failure to disclose this obvious conflict of interest at this stage in the litigation. The Court may also choose to consider that in Plaintiffs' Motion for Certification, Plaintiffs' counsel alleged to this Court that Defendants had not produced the list of residents as requested in discovery, despite having provided this list and additional supplements thereto well in advance of the filing of Plaintiffs' Motion for Certification. *See* note 1, supra. The nondisclosure of counsel's conflict of interest and Plaintiffs' misrepresentation regarding Defendants' compliance with discovery are material to considering counsel's adequacy to represent the putative class.

Finally, the Court should consider the severe deficiencies of Plaintiffs' Motion for Certification, including but not limited to counsel's repeated treatment of Rule 23 as a pleading standard. Class counsel owes a fiduciary duty to the class members, and doubts that class counsel will represent the class loyally and competently require denial of class certification—class counsel's conduct need not be "egregious" to raise sufficient doubt to deny certification. *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) (holding that class counsel's conduct

29

need not be "egregious" in order to deny class certification on the basis of inadequacy of counsel). Here, whether by conscious choice, unwitting inadvertence or lack of knowledge, or lack of resources, the thoroughgoing deficiencies of Plaintiffs' threadbare motion in defiance of Rule 23's rigorous requirements suggest that counsel may not be able to adequately represent even the named Plaintiffs, let alone the putative class members whose fortunes would be bound up with the named Plaintiffs.

### 3.     23(b) Requirements

A.  Plaintiffs have not established the requirements of Rule 23(b)(3).

Rule 23(b)(3) requires two showings: first, that common questions or law or fact predominate over questions affecting only individual class members (the "predominance" requirement), and (2) that a class action is superior to other available methods of resolving the controversy (the "superiority" requirement). *Id.* Plaintiffs have not made either showing.

#### i.     *Plaintiffs have not established predominance.*

Although Rule 23(b)(3)'s predominance requirement builds on the commonality requirement, it is far more demanding. *Comcast,* 569 U.S. at 24. Rule 23(b)(3) permits class certification only if the questions of law or fact common to class members predominate over questions that are individual to members of the class. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012). Not only must common questions predominate, but they must represent a significant aspect of the case. *Schroeder*, 146 F.4th at 574.

30

Common questions can predominate if a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class." *Messner,* 669 F.3d at 815. If individual inquiries are necessary to make a prima facie showing on any given question, and class members have to present evidence that varies from member to member, then it is an individual question. *Id.* But if the same evidence will suffice for each member to make a prima facie showing, then it is a common question. *Id.*

Plaintiffs' argument before the Court as to predominance is this—once again— a "mere pleading," *Wal-Mart*, 564 U.S. at 530:

> In this case, central questions of law and fact are common to both Plaintiffs and the members of the class. Both Plaintiffs and members of the class were subject to the same pattern and practice whereby residents at Vision of Hope were forced by serious harm or threats of serious harm to furnish forced, unpaid labor to Vision of Hope, Faith Church and Faith Church's other satellite organizations.

DE 27, p. 7. Such a "[m]ere *assertion* by class counsel that common issues predominate is not enough. That would be too facile" in light of Rule 23's rigorous requirements. *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014). Rule 23, after all, "does not set forth a mere pleading standard." *Id. (quoting Wal-Mart*, 654 U.S. at 350). To determine whether predominance is satisfied, the court must "receive evidence … and resolve the disputes before deciding whether to certify the case." *Id.* at 1085. Thus, the predominance analysis necessarily begins with the elements of the underlying cause of action. *Messner*, 669 F.3d at 813.

Here again, the Court cannot even attempt to assess predominance based on Plaintiffs' Motion, because Plaintiffs fail to set out the elements of the underlying claim as the first step of the predominance analysis requires. Second, Plaintiffs have

31

not provided the Court any evidence or argument to affirmatively prove predominance, because they've instead treated predominance as a pleading standard. Third, Plaintiffs cannot establish predominance for the same reason they cannot establish commonality and typicality: there is no common nucleus of operative fact.

A TVPA forced-labor claim has seven elements: that the employer (1) knowingly (2) obtained the labor/services by (3) means of serious harm or threats of serious harm[5], (4) which are either physical, nonphysical, psychological, financial, or reputational, (5) that is sufficiently serious, under all the surrounding circumstances, (6) to compel a reasonable person of the same circumstances to continue performing that labor/service to avoid incurring the harm. 18 U.S.C. § 1589. The seventh element is "a second scienter requirement," *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)—that the employer must have "intended to cause the victim to believe that she would suffer serious harm … if she did not continue to work," *Dann*, 652 F.3d at 1170 (citing *Calimlim*, 538 F.3d at 711–12).

As discussed above in the commonality and typicality section, each named Plaintiff and each class member alleges different types of harms, and those harms all arise from different events rather than one global act on the part of VoH. Thus, a class action in this matter would necessarily devolve into individual inquiries for each class member, wherein they must identify first their background, then what harm they allege to have suffered, and for each of those harms, they must identify the dates

---

[5] The statute also includes "by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person," however Plaintiffs have not alleged these elements in this lawsuit and so we do not include them here.

32

of the harm, the person who did the harm, the facts underlying the harm, whether the harm was "sufficiently serious, under all the surrounding circumstances," whether a reasonable person from that class member's background would have been compelled to perform the work because of the harm, how that harm compelled that specific resident to stay at VoH, and how that harm compelled that resident to continue performing the ministry to others. In addition, to ascertain whether the second scienter requirement is present for each and every alleged harm, a deeper inquiry into whether VoH *intended to cause the class-member to believe* they would suffer serious harm if they did not do the ministry to others is required, and what evidence each class member would use to support the scienter requirement.

And again, since Plaintiffs' specific harms are based on VoH's use of inherently religious concepts and their religious practices (e.g. shunning, being labeled in "rebellion," Bible-based consequences), answering these individual inquiries would impermissibly require the Court to wade into matters of religion to ascertain whether inherently religious practices and concepts can constitute harm under the TVPA. *See* discussion in section 2A, supra.

In addition, predominance requires that Plaintiffs show that the damages resulting from the injury are measurable on a class-wide basis through the use of common methodology. *Comcast,* 569 U.S. at 30. And, "[i]f a model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. Plaintiffs offer no damages model to the Court, nor any plan to measure damages. The failure

to include any damages model is a fatal flaw in the Motion and alone is a basis for denial of certification.

But in addition, Plaintiffs have readily admitted that "it may be the case that each member of the class requires an individual hearing on damages." DE 27, p. 8. Thus, Plaintiffs' own Motion admits that damages are not susceptible to class-wide proof through use of a common methodology. Plaintiffs thus ask this Court to use its resources to hold "100 or more" mini trials¸ *see id.* at 4, to ascertain damages for each class member. This is improper, and is directly contrary to Rule 23(b)(3)'s predominance requirement that common questions predominate over individual ones.

Individual questions vastly predominate over any common questions Plaintiffs could offer or have offered, and therefore predominance has not been met and class certification should be denied.

### ii.    *Plaintiffs have not established superiority.*

To satisfy superiority, Plaintiffs must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The following factors are relevant: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs have little to say as to element (1), the class members' interest in individually controlling the prosecution or defense of separate actions. DE 27, pp. 7-8. To the extent they address it at all, it is only by asserting that a class action's anonymity will better serve the class's interests than individual actions. *Id.* p. 7. But that is irrelevant; anonymity is an incidental effect of a class action, not a justification for certifying one. As to element (4), Plaintiffs offer only their unelaborated, *ipse dixit* assertion that "there ought to be no unusual difficulties. The class is anticipated to be of a manageable size." *Id.* p. 8. Aside from being yet another impermissible "mere pleading," *Wal-Mart*, 564 U.S. at 350, Defendants also dispute that this class is a manageable size. As stated previously, Plaintiffs' counsel is a solo practitioner, and a class action of this scale—by his own reckoning, "100 or more" with mini-trials as to damages for each of them, *see id.* pp. 4, 8—will require the devotion of time and resources which are likely to be too difficult for one attorney alone to manage, and Plaintiffs' counsel has provided no evidence to show otherwise.

But regardless, a class action is not the superior method for adjudicating this controversy. As discussed in the ascertainability and numerosity sections of this brief, Plaintiffs class size claim is a number artificially inflated by Plaintiffs by way of their impermissibly overbroad class definition that literally includes every single resident of VoH for the last ten years. If a class can be ascertained for this action, the number of members is expected to be far, far less than that alleged by Plaintiffs. That said, a class action will not be the superior method to adjudicate the slim number of claims, if any claims exist at all.

**4.      Plaintiffs have not established the requirements of Rule 23(b)(1).**

Finally, Plaintiffs seek to satisfy Rule 23(b)(1), which requires a showing that prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the opposing party, or, that would be dispositive of the interests of the other members not parties to the individual adjudications. Fed. R. Civ. P. 23(b)(1).

Again, Plaintiffs treat this section as a pleading standard, merely reciting those elements to the Court with no supporting analysis or evidence. DE 27, pp. 6–7. This falls short of Rule 23's rigorous requirements to "affirmatively demonstrate" each section of the Rule. *Wal-Mart,* 654 U.S. at 350.

However, pleading standard aside, Rule 23(b)(1) cannot be satisfied because, as indicated with respect to commonality, typicality, and predominance, each specific harm alleged by the named Plaintiffs and affiants arises from different events and conduct, rather than one global event. Individual adjudications would not be dispositive of the interest of other non-parties to that adjudication because again, all the harms alleged are different from person to person, and arise from different conduct. Therefore, prosecuting these claims by class action would be in derogation to Rule 23's purpose and intent—to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economic manner, *Falcon*, 457 U.S. at 155—and individual adjudications are required. Plaintiffs have not proven their class satisfies Rule 23(b)(1), and their Motion for Class Certification should be denied.

36

## CONCLUSION

Plaintiffs' Motion for Class Certification does not meet Rule 23's rigorous requirements. Many of the Rule's requirements are supported by nothing more than Plaintiffs' unsupported "mere pleading," which cannot satisfy Rule 23. And even the affidavits, so far as they go, are insufficient to support certification because they demonstrate there is in fact no common nucleus of operative fact as to any claims. Plaintiffs have proven none of the elements of Rule 23(a), 23(b)(1), or 23(b)(3), and their Motion for Class Certification should be denied.

Respectfully submitted,

*/s/ Barry L. Loftus*
Barry L. Loftus     #20993-79
Jason W. Bennett #22895-79
Kirstie E. Klutzke  #38239-79
300 Main Street, Suite 900
Lafayette, IN 47901
Phone: (765) 423-1561
Fax: (765) 742-8175
Email: bll@stuartlaw.com
       jwb@stuartlaw.com
       kek@stuartlaw.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on July 9, 2026, the foregoing document was served upon all counsel of record using the Court's CM/ECF system.

*/s/ Barry L. Loftus*
Barry L. Loftus

37